IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLIFTON WILLIAMS, | : | |
| | : | |
| Plaintiff, | : | CIVIL NO. 4:CV-08-1915 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JEFFREY BEARD, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

August 30, 2010

## THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

Plaintiff Clifton Williams ("Plaintiff" or "Williams"), an inmate presently

confined at the Mahanoy State Correctional Institution ("SCI Mahanoy") in

Frackville, Pennsylvania, initiated the above action *pro se* by filing a Complaint under

the provisions of 42 U.S.C. § 1983.  The Complaint names the following

administrative personnel as Defendants: Dr. Jeffrey Beard, Secretary of the

Pennsylvania Department of Corrections ("DOC"); Ulli Klemm, Administrator of

Religious and Volunteer Services for the DOC; and Robert Bitner, Chief Hearing

Examiner for the DOC.  The Complaint also names the following current or former

employees of SCI Mahanoy as Defendants: John Kerestes, Superintendent; Edward J.

Klem, former Superintendent; Patti Ramer, School Principal; Mike Vuksta, Unit

Manager; Richard Spaide, Unit Manager; Robert Yarnell, Food Services Supervisor; and Cheryl Stanitis, Food Services Supervisor.

In his Complaint, filed on October 17, 2008, Williams asserts claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and the Free Exercise Clause of the First Amendment of the Constitution. (Doc. 1, Complaint, at 6.) Williams, who identifies himself as a Muslim, alleges that, on October 23, 2006, while he was on break from his shift as a kitchen worker at SCI Mahanoy, he was offering the noon prayer in the far corner of the diet room within the kitchen complex when Defendant Stanitis entered the room, saw Williams, and directed him to stop immediately. (Doc. 1 at 6-8.)   However, Williams continued praying. (*Id.* at 8.) Williams alleges that, after he finished praying and returned to the general break area within the kitchen complex, Defendant Yarnell summoned him and instructed a staff member to escort Williams back to his housing unit. (*Id.*) Although Williams pleaded guilty to the resulting misconduct, which charged him with failing to obey an order and presence in an unauthorized area, and was sanctioned with the loss of his kitchen job, he alleges that the sole reason that he lost his job was because he was exercising his constitutional right to practice his religion. (*Id.* at 9.)

Williams further alleges that, in appealing from the loss of his job, he requested

2

review of the prison policies, which he describes as being unethically oppressive to the constitutionally protected right to practice the religion of Islam.  (*Id.* at 10.)  However, he alleges that Defendants Ramer, Vuksta, Spaide, Edward Klem, and Bitner failed to address the illegality of these policies in disposing of his appeals, and merely upheld the guilty finding because Williams pled guilty to the charges.  (*Id.* at 10-14.)  He further alleges that, when he sent correspondence in October 2007 to Defendant Beard requesting that he remedy these constitutional violations, Beard failed to remedy the violations and instead improperly referred the matter to Defendant Ulli Klemm.  (*Id.* at 15-17.)

As relief, Williams seeks a declaratory judgment explaining his right to offer obligatory prayers at the prescribed times and in the prescribed manner and the legal duty of prison staff to accommodate this protected right in a reasonable manner.  (*Id.* at 18.)  He also seeks an injunction directing Defendant Beard to order all DOC employees to cease their illegal conduct against Plaintiff and his property now and in the future and to refrain from any retaliatory acts against Plaintiff for utilizing the judicial process to uphold his Constitutional rights.  (*Id.* at 19.)  He seeks the same form of injunctive relief as to Defendant Kerestes with respect to SCI Mahanoy employees, and in particular as to SCI Mahanoy kitchen staff.  (*Id.* at 19-20.)  He also

3

requests that Kerestes be ordered to provide him with Z-code status (single cell status). (*Id.* at 20.) Finally, Williams seeks compensatory and punitive damages. (*Id.* at 21-22.)

## I.     PROCEDURAL BACKGROUND

Service of the Complaint was directed by Order dated November 25, 2008. (Doc. 8.) After obtaining an extension of time, Defendants filed an Answer to the Complaint on February 17, 2009. (Doc. 15.) The parties engaged in discovery, after which a Motion for Summary Judgment was filed on Defendants' behalf on September 4, 2009. (Doc. 30.) A supporting brief (Doc. 34), a Statement of Material Facts (Doc. 32) and supporting exhibits (Doc. 33) were filed on September 23, 2010.

Plaintiff has filed his opposition to the Motion, including a document entitled "Opposition to Defendants' Motion for Summary Judgment" (Doc. 38), which consists of a seven (7) paragraph statement of his reasons for opposing the Motion; a Statement of Material Facts (Doc. 39); supporting exhibits (Docs. 39-2 through 39-9); an opposition brief (Doc. 41); and additional supporting exhibits (Doc. 41-2). Accordingly, the Motion for Summary Judgment is fully briefed and ripe for review.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in

briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).  However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them.  *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of  *material* fact."  *Anderson*, 477 U.S. at 247-48.

## III.   STATEMENT OF MATERIAL FACTS

With the above standard of review in mind, the following are the facts material to the present motion, drawing any reasonable inferences in favor of the non-moving party, Williams.

Williams is a state inmate who has been incarcerated at SCI Mahanoy since November 3, 2005.  (Doc. 32, Defs. SMF, ¶ 1; Doc. 33-5, Williams Dep., at 5, Page 15.)  He has been a practicing Muslim since 1975, and therefore had been practicing

6

his religion for the twenty-two (22) years during which he was incarcerated prior to the October 23, 2006 incident that forms the basis for this action.  (Doc. 33-5 at 3, Page 9; Doc. 39, Pltf. SMF, ¶ 2.)  Williams' Muslim faith requires, among other observances not relevant to this lawsuit, that he engage in prayer five (5) times each day.  (Doc. 32 ¶ 2; Doc. 33-5 at 4, Page 10.)  There is flexibility in the timing of the five (5) daily prayers.  (Doc. 32 ¶ 3; Doc. 33-5 at 4, Page 12.)  Specifically, as explained by Williams in his deposition testimony, from the time that a prayer becomes due, there may be about forty-five (45) minutes to an hour, or sometimes a little more, in which the prayer may be made in a timely fashion.  (Doc. 33-5 at 4, Page 12.)

On October 23, 2006, the time for saying the "noon" prayer commenced at around 1:00 p.m. or 1:02 p.m.  (*Id.*, Page 13.)  Williams was assigned to a job in the kitchen at SCI Mahanoy, and on that date, he was scheduled to work a shift in the kitchen from 1:00 p.m. until 6:45 p.m.  (Doc. 32 ¶¶ 5, 6; Doc. 39 ¶¶ 5, 6.)  At the beginning of his shift on October 23, Williams did not have an immediate job assignment.  (Doc. 32 ¶ 7; Doc. 39 ¶ 7.)  Because the time to offer the "noon prayer" had commenced, Williams began searching for an area where he could offer the prayer.  (Doc. 39 ¶ 7.)  When he found that other areas in which he usually offered prayer were occupied, he remembered that he had seen other Muslim kitchen workers pray in the

7

diet room located within the kitchen complex.  (*Id.*)  Therefore, Williams went to the diet room, and received an okay from the inmate workers in that room to offer his prayer.  (*Id.*)

Williams situated himself in the diet room between a wall on his right and a hot box on his left.  (Doc. 32 ¶ 8; Doc. 33-5 at 11, Page 39.)  Williams described during his deposition that there also was a wall in front of him, and that there were small openings between the hot box and the wall in front of him, and to the rear of the hot box.  (Doc. 33-5 at 11, Pages 39-40.)  After Williams had begun offering his prayer, Defendant Cheryl Stanitis, a staff member in the Food Services Department at SCI Mahanoy, entered the diet room, saw Williams behind the hot box[1], and ordered him to stop what he was doing and come out immediately.  (Doc, 32 ¶ 9; Doc. 39 ¶ 9; Doc. 33-2, Stanitis Decl., ¶ 7.)  Williams did not stop praying when Stanitis ordered him to do so.  (Doc. 32 ¶ 10; Doc. 39 ¶ 10; Doc. 33-5 at 11, Page 40.)  Williams explains that he did not stop praying because once a Muslim enters the ritual of formal prayer, he is to continue the observance until the prayer is completed unless someone comes into the area in which he is praying and actually threatens the prayer.  (Doc. 39 ¶ 10; Doc. 33-5 at 11, Page 40.)  Therefore, Williams completed his prayer, left the diet room, and

---

[1]Williams believes that Stanitis was able to see his body movement through the small opening at the rear of the hot box.  (*See* Doc. 33-5 at 11, Page 40.)

8

subsequently was escorted from the kitchen to his housing unit at the direction of Defendant Yarnell.  (Doc. 32 ¶ 16; Doc. 39 ¶ 16; Doc. 33-5 at 12, Pages 42-43.)

Inmates at SCI Mahanoy must comply with orders from staff members, and inmates who refuse to obey orders from staff members are issued misconduct reports. (Doc. 33-2, Stanitis Decl., ¶ 2.) Also, inmates at SCI Mahanoy are not allowed to be present in certain areas of the institution, and a misconduct report is issued to any inmate who is present in an unauthorized area.  (*Id.* ¶ 3.)  In accordance with the latter SCI Mahanoy policy, no inmate is authorized to be in the diet room unless the inmate has been assigned a job duty there.  (*Id.* ¶ 5; Doc. 32 ¶ 11.)  Williams contends that the lack of authorization to be in an area of the kitchen does not mean that an inmate is prohibited from being in that area.  (Doc. 39 ¶ 11.)  Specifically, while he admits that he was not assigned to a job duty in the diet room at the time of the above incident, and therefore was not authorized to be in that room, he claims that he was not prohibited from being in that area either.  (*Id.* ¶ 12; Doc. 32 ¶ 12.)

According to Defendants, inmates assigned to work in the Food Services Department must remain in the location of their assigned tasks, and if an inmate is not actively involved with an assigned task, that inmate must sit at a table in the break area of the kitchen.  (Doc. 32 ¶ 13; Doc. 33-2 ¶ 15.)  In contrast, Plaintiff contends that in

actual practice, inmates routinely migrate to different areas of the kitchen complex at SCI Mahanoy during breaks to socialize, read, or engage in other recreational pursuits. (Doc. 39 ¶ 13; Doc. 33-5 at 7, Pages 24-25.)

Inmates working in the kitchen at SCI Mahanoy are permitted to pray while sitting at the tables in the break area.  (Doc. 32 ¶ 14; Doc. 33-5 at 10-11, Pages 37-39.) Although Plaintiff agrees that prison policy permits inmates to pray while sitting at break area tables, he contends that this policy is discriminatory to Muslims because it excludes the manner in which able-bodied Muslims are required to perform their five (5) daily obligatory prayers.  (Doc. 39 ¶ 14.)  Plaintiff also finds the break area of the kitchen to be an inappropriate area to offer the prescribed prayer in the prescribed manner because of the noise from conversations inmates have in the break area as well as the fact that inmates use a bathroom nearby and track urine back into the area.  (*Id.* ¶ 15; Doc. 32 ¶ 15; Doc. 33-5 at 10, Pages 36-37.)

After the incident described above, Defendant Stanitis issued a Misconduct Report charging Williams with refusal to obey an order and presence in an unauthorized area.  (Doc. 33-3, Misconduct Report.)  Any inmate who is charged with a misconudct has the opportunity to attend a hearing and confront witnesses with regard to the charges.  (Doc. 33-2, Stanitis Decl., ¶ 13.)  At a hearing regarding the

Misconduct Report issued by Stanitis, Williams pleaded guilty to the charges of presence in an unauthorized area and refusal to obey an order. (Doc. 33-4, Disciplinary Hearing Report.)

Although Defendant Stanitis asserts that she did not issue the Misconduct Report based on Plaintiff's religious faith or practices, but rather based on the security concerns of SCI Mahanoy, Plaintiff contends that her assertion is pretextual to cover her contempt for the formal ritual of Muslim prayer. (Doc. 32 ¶ 19; Doc. 39 ¶ 19.) However, Stanitis explains that, in the Food Services Department, there are utensils and tools that could be used as weapons and that the staff members take measures to limit the number of inmates with access to these utensils and tools. (Doc. 33-2, Stanitis Decl., ¶ 18.) The Food Services Department typically employs approximately 375 to 400 inmates, and only twenty-six (26) staff members. (*Id.* ¶ 19.) Therefore, in order to maintain order in the Department, inmates cannot be allowed to stray from their assigned locations or from the break area to unauthorized areas where their conduct might threaten institutional security and go undetected by staff members.[2] (*Id.* ¶ 20.)

---

[2] Williams counters the statement of fact by Defendants explaining the rationale behind not allowing inmates to stray from their assigned locations or break area in the SCI Mahanoy kitchen with the statement, "In this matter, pretextual to cover constitutional violations." (*See* Doc. 39 ¶¶ 21-22.) However, he fails to cite to a portion of the record that supports his statement. (*See id.*) Therefore, he has failed to adequately oppose Defendants' statement of the rationale behind the policy in the manner required by Middle District of Pennsylvania Local Rule 56.1.

Even though he testified in his deposition that he did not discuss his need to offer his prayers with Yarnell at any time, Plaintiff named Yarnell as a Defendant to this action in his capacity as a kitchen supervisor because Yarnell allegedly upheld Defendant Stanitis' unconstitutional actions, his policy discriminates against Muslim kitchen workers, and he gave encouragement to Stanitis and other kitchen staff to prohibit Muslim kitchen workers from offering their prayers at their prescribed times. (Doc. 32 ¶ 23; Doc. 39 ¶ 23; Doc. 1-2, Guyton Decl., at 41.)

Plaintiff named Defendant Beard as a Defendant to this action because Plaintiff wrote a letter to Beard about the policy Plaintiff regards as unconstitutional, and Beard referred the letter to Defendant Ulli Klemm for a response. (Doc. 33-5 at 12-13, Pages 45-46.)

Plaintiff has sued Ulli Klemm because he upheld the unconstitutional actions, procedures, and policies of Defendants Stanitis and Yarnell. (Doc. 39 ¶ 24.)

Plaintiff has sued Defendants Ramer, Vuksta, Spaide, Klem, and Bitner because they disposed of his appeals from the Misconduct Report. He contends that, even though they upheld the Hearing Examiner's decision on the basis that Plaintiff pleaded guilty to the charges, they had an obligation to examine the policies and procedures that Plaintiff brought to their attention in his appeals and that he alleged were

12

unconstitutional.  (Doc. 33-5 at 13-14, Pages 47-51.)

Finally, although Plaintiff recognizes that Defendant Kerestes was not the Superintendent at SCI Mahanoy at the time of the events that form the basis for this Complaint, he has sued him for prospective injunctive relief in that Kerestes, as the current Superintendent, will be the policy maker and reviewer for the institution going forward.  (*Id.* at 13, Pages 48-49.)

## IV.   DISCUSSION

### A.   Respondeat Superior

In order to state an actionable civil rights claim, a plaintiff must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law, and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Groman v. Township of Manalapan,* 47 F.3d 628, 638 (3d Cir. 1995); *Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1141-42 (3d Cir. 1990).

Consequently, civil rights claims cannot be premised on a theory of *respondeat superior.  Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim. *See Rizzo v.*

*Goode,* 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077

(3d Cir. 1976). As explained in *Rode*:

> A defendant in a civil rights action must have personal involvement in the
> alleged wrongs . . . . [P]ersonal involvement can be shown through
> allegations of personal direction or of actual knowledge and acquiescence.
> Allegations of participation or actual knowledge and acquiescence,
> however, must be made with appropriate particularity.

*Rode,* 845 F.2d at 1207.

In the instant case, Williams has not alleged any personal involvement by

Defendant Beard in the alleged wrong.  He merely alleges that he sent a letter to Beard

regarding the allegedly unconstitutional polices and practices at SCI Mahanoy with

regard to Muslim kitchen workers, but admits that Beard did not engage in reviewing

the matter, but rather referred it to Ulli Klemm, who provided a response to Williams'

letter.  (*See* Doc. 33-5 at 13, Pages 46-47; Doc. 1-2, Exhibits to Plaintiff's Complaint,

at 39, Klemm Response.)  Consequently, Williams has failed to allege facts showing

that Defendant Beard was personally involved in the events or occurrences that form

the basis of his claims, and the claims against Defendant Beard will be dismissed for

lack of personal involvement.

## B.   RLUIPA Claim

RLUIPA provides, in relevant part, that "[n]o government shall impose a

14

substantial burden on the religious exercise of a person residing in or confined to an

institution . . . even if the burden results from a rule of general applicability, unless the

government demonstrates that imposition of the burden on that person (1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means

of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-l(a).

Initially, to prevail on a claim under RLUIPA, an inmate must establish that he

possesses a sincerely held, authentic religious belief, the exercise of which the

government has substantially burdened. *See Cutter v. Wilkinson*, 544 U.S. 709, 725

n.13 (2005). Therefore, while "RLUIPA bars inquiry into whether a particular belief

or practice is 'central' to a prisoner's religion, *see* 42 U.S.C. 2000cc-5(7)(A), the Act

does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Id.*

To state a claim under RLUIPA, an inmate plaintiff bears the *prima facie* burden

of showing that a prison policy or practice has substantially burdened the practice of

that inmate's religion. 42 U.S.C. § 2000cc-2(b); *Washington v. Klem,* 497 F.3d 272,

277-78 (3d Cir. 2007). The Third Circuit has adopted the following definition of

"substantial burden" in this context:

> For the purposes of RLUIPA, a substantial burden exists where: 1) a
> follower is forced to choose between following the precepts of his religion
> and forfeiting benefits otherwise generally available to other inmates
> versus abandoning one of the precepts of his religion in order to receive a

15

> benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Washington,* 497 F.3d at 280.

If an inmate proves that the government substantially burdened the exercise of a sincerely held religious belief, the burden then shifts to the government and the Court must determine whether the government has demonstrated that the burden was imposed both in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest. *See Washington*, 497 F.3d at 282. In making this determination, the Court is mindful of the fact that "'context matters'", *Cutter*, 544 U.S. at 723 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)), and gives "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* (quoting S.Rep.No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900.)

In the instant case, Williams has demonstrated that he possesses a sincerely held, authentic religious belief that to properly practice his Muslim faith, he must offer prayer five (5) times per day in the prescribed manner, which involves prostrating himself on a clean surface in a quiet area and continuing prayer until its completion.

16

(*See* Doc. 39 ¶¶ 2, 10, 14, 15; Doc. 11 at 5, Williams Decl.; Doc. 39-8 at 2, McCrea Decl.)

We also find that Williams has demonstrated that his religious exercise was substantially burdened when he was employed in the SCI Mahanoy kitchen in that he was forced to choose between offering prayer in the manner consistent with his sincerely held religious belief and being disciplined for being in an unauthorized area and for refusing to obey an order to stop praying.  Specifically, even though Williams was permitted to pray in the break area of the kitchen, he was required to substantially modify his behavior by sitting, rather than prostrating himself, to offer prayer, thus violating his beliefs.  *See Washington*, 497 F.3d at 280.

Nevertheless, we find that Defendants have demonstrated that the burden was imposed both in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest.  *See id.*  The maintenance of institutional order and security has been held to be a compelling government interest.  *Pell v. Procunier,* 417 U.S. 817, 822 (1974)*; see also Williams v. Bitner,* 359 F. Supp. 2d 370, 376 (M.D. Pa. 2005) (Conner, J.).  Defendants have demonstrated that requiring inmates to stay in authorized areas and to obey staff orders, without exception, furthers the compelling government interest in maintaining order

and security and that these policies are the least restrictive means of furthering that interest.  We observe that there can be no less restrictive means of furthering this interest because it would not be possible to supervise Muslim inmates if they were permitted to choose areas they deem appropriate to offer their prayer during work shifts, thereby jeopardizing institutional security.  The interest in maintaining institutional order and security is particularly significant in an area such as the kitchen where inmates significantly outnumber staff, and kitchen tools and utensils that potentially could be used as weapons are accessible by inmates.  Moreover, if Muslim inmates were permitted to disregard staff orders without being charged with a misconduct because the order was issued while they were praying, disorder would ensue among the rest of the prison population as they protest their inability to disregard staff orders without disciplinary consequences.  We therefore conclude that Defendants have demonstrated that the burden imposed on Williamson' religious exercise in the SCI Mahanoy kitchen was imposed both in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest.  *See Washington*, 497 F.3d at 282.  Therefore, Defendants are entitled to judgment as a matter of law with regard to Williams' RLUIPA claim.

### C.    First Amendment Claim

Although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quotations omitted). In *Shabazz,* the Supreme Court determined that prison regulations that allegedly infringe upon an inmate's "religious" rights as protected by the First Amendment must be reviewed under a "reasonableness" test that is less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Id.* In so concluding, the Court held that when a prison regulation impinges on inmates' constitutional rights "the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349.

The *Shabazz* Court applied the four (4) factor test set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987) in determining whether the regulation was "reasonably related." The four (4) factors set forth by the *Turner* Court are as follows: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other

19

inmates, and on the allocation of prison resources generally"; and (4) the availability of "ready alternatives" for furthering the governmental interest. *Turner*, 482 U.S. at 89-90.

A plaintiff bears the burden of persuasion. *See Beard*, 548 U.S. at 529 (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.") Moreover, we accord great deference to prison administrators in the adoption and execution of policies and practices that are necessary to preserve internal order and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 527 (1979).

Williams alleges that his First Amendment right to freely exercise his religion was violated because SCI Mahanoy staff provided no accommodation for Muslim kitchen staff to offer their prayers in the manner prescribed by their religion during their work shifts in the kitchen. (*See* Doc. 41 at 10-11, Pltfs. Opposition Brief.)  He alleges that he lost his job for engaging in the worship that is mandated by his religion. (*Id.* at 11.)  Although Williams was exercising his right to practice his religion at the time of the incident giving rise to his claims, he was doing so in an unauthorized area and failed to obey a staff order issued by Defendant Stanitis to leave the area. Therefore, the SCI Mahanoy policies that allegedly infringed on Williams' right to

freely exercise his religion are the DOC policies requiring that inmates stay out of

unauthorized areas and obey orders.  The legitimate governmental interest behind these

policies is the need to maintain institutional order and security.  We find that there

clearly is a rational connection between requiring that inmates stay out of unauthorized

areas and obey orders and maintaining order and security in an institution.  In addition,

we observe that these policies are neutral in that they apply to all inmates and are

enforced regardless of the reasons why they fail to obey orders or are present in

unauthorized areas.[3]

In evaluating the second *Turner* factor, "courts must examine whether an inmate

has alternative means of practicing his or her religion generally, not whether an inmate

has alternative means of engaging in the particular practice in question." *Dehart v.

Horn,* 227 F.3d 47, 55 (3d Cir. 2000).  Where "other avenues remain available for the

exercise of the inmate's religious faith, courts should be particularly conscious of the

measure of judicial deference owed to corrections officials . . . ." *Id.* at 55, 57.  *See

also Sutton v. Rasheed*, 323 F.3d 236, 255 (3d Cir. 2003).  In this case, Williams has

---

[3]In opposing the instant Motion, Williams repeatedly emphasizes that the policy requiring inmates to stay out of unauthorized areas in the kitchen was not always enforced and that inmates frequently were present in areas where they did not have a job assignment.  We note that even though enforcing a policy is not practically possible in every instance, the fact that it is a policy means that it may be enforced by prison staff at any time.

not alleged that DOC policy inhibits his ability to practice his religion generally.  For example, he does not claim that he is not able to participate in group worship or offer prayer in the prescribed manner his cell.  Moreover, Williams also had the alternative of offering prayer in the break room of the kitchen even though it would not have been in the exact manner required by his religion.  Consequently, it is evident that he had alternative means to express his religious beliefs as an inmate at SCI Mahanoy.

As to the third *Turner* factor, to the extent that Williams suggests that an exception be made for Muslim inmate kitchen workers to the DOC policies of requiring inmates to obey orders and stay out of unauthorized places, allowing such an exception would have a negative impact both on prison resources and institutional security.  If, for example, Muslim inmates were permitted to choose any area in the kitchen complex they deem appropriate for offering prayer, it would be logistically impossible for prison staff to monitor the whereabouts of inmates at any given time in order to maintain security within the prison.  The same is true if inmates were permitted to leave the kitchen area to return to their cells to pray- prison staff would necessarily need to monitor their trips back and forth.  Moreover, if, for example, a policy were enacted whereby Muslim inmates would be permitted to ignore staff orders merely because they are praying, disorder would ensue as other non-Muslim inmates

challenged the fairness of such a policy and/or acted out in protest against such a policy either generally or against Muslim inmates.

Another possible accommodation would be the designation of a permanent space other than the break room within the kitchen complex of SCI Mahanoy for Muslim inmates to offer prayer.  This accommodation would require monitoring by correctional staff to ensure that its purpose is not abused both by non-Muslim and Muslim inmates, and therefore, would strain security resources.  In addition, it is highly likely that designating such a space is not possible from a practical standpoint where the entire kitchen space is needed to prepare meals for the large inmate population.

Another possible accommodation would be to exempt Muslim inmates from the requirement that all capable inmates are initially required to work in Food Services for a minimum of three (3) months before being considered for job reassignment.  (*See* Doc. 41-2, Pltf. Ex. I, 2/24/09 Response to Request Regarding Employment Policy.) Williams observes that he did not have any difficulty in offering his prayers when he was employed as a block worker, but that he was involuntarily terminated from that position to fulfill the requirement that he work in the kitchen. (Doc. 39 ¶ 5.)  However, it is likely that allowing an exemption from this requirement for all Muslim inmates is

not practically possible, particularly if the number of Muslim inmates in the prison population is significant enough that their unavailability to work in the kitchen would leave the kitchen short-staffed.

With regard to the fourth factor, as stated in *Turner*, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90 (citing *Block v. Rutherford*, 468 U.S. 576, 587 (1984)). It is difficult to fathom a more reasonable or practical alternative to maintaining order and security in a prison than enacting policies requiring inmates to stay out of unauthorized areas and to obey staff orders and to enforce those policies without exception. Accordingly, no reasonable alternative existed to maintain institutional order and security than to issue a misconduct after Williams was discovered in an unauthorized area and refused to obey a staff order.

To summarize, it is evident that the staff at SCI Mahanoy have a legitimate penological interest in maintaining institutional order and security by enforcing the policies requiring inmates to obey staff orders and stay out of unauthorized areas without exception for religious or any other reasons. Accordingly, Williams has failed to meet his burden to show that these policies are invalid such that the issuance of a Misconduct Report to him after he was present in an unauthorized area and failed to

24

obey a staff order is not reasonably related to a legitimate penological interest in maintaining prison order and security.   Therefore, Defendants' are entitled to judgment as a matter of law as to Williams' First Amendment claim.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted, and the Clerk of Court will be directed to enter judgment in favor of Defendants.   An appropriate Order will enter.